J-A29037-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| HIDDEN RIDGE CONDOMINIUM ASSOCIATION, INC., A PENNSYLVANIA NON-PROFIT CORPORATION AND JILL WANZIE, TOM BURICH, KATHLEEN RAUSCHER, KAREN LOFE AND CORY SIGLER, AS TRUSTEES AD LITEM OF THE EXECUTIVE BOARD OF THE HIDDEN RIDGE CONDOMINIUM ASSOCIATION, ON THEIR OWN BEHALF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | No. 775 WDA 2024 |
| P. RONALD SABATINO, A/K/A RONALD SABATINO, SCIOTO CONSTRUCTION COMPANY, A PENNSYLVANIA CORPORATION AND T&R PROPERTIES, INC., AN OHIO CORPORATION | |
| APPEAL OF: SCIOTO CONSTRUCTION COMPANY | |

Appeal from the Order Entered June 20, 2024
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-08-021879

BEFORE: OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: May 6, 2025**

Scioto Construction Company ("Scioto") appeals from the order entered

on June 20, 2024, which denied Scioto's motion for post-trial relief; awarded

Hidden Ridge Condominium Association, Inc. ("Hidden Ridge") $218,688.00,

plus costs, in connection with its petition to enforce a settlement agreement; and struck a quitclaim deed recorded by Scioto.[1] After careful review, we affirm.

This matter has a rather lengthy procedural history, including a trial on an unrelated issue and five prior appeals to this Court. Pertinent to this appeal:

> Scioto developed a condominium project[2] in South Park Township[ (the "Township")], Allegheny County.[1] In 2008, Hidden Ridge, on behalf of itself and all unit owners, initiated a civil action [in the Court of Common Pleas of Allegheny County, Pennsylvania, at docket number GD-08-21879 ("the "Hidden Ridge Action"),] against Scioto and several other related defendants, asserting claims for, *inter alia*, unpaid condominium fees, breach of contract, breach of warranties, and misappropriation of funds. … As the trial court explain[ed]: "The crux of that litigation concerned the ramifications of the condominium plan's designation as a 'non-flexible' plan rather than a [']flexible plan,'" which resulted in Scioto's obligation to pay condominium fees. Trial Ct. Op., 11/8/21, at 7. The issue of the unpaid fees proceeded to a jury trial, and on June 4, 2012, the jury entered an award in favor of Hidden Ridge in the amount of

---

[1] The trial court certified its June 20, 2024 order as a final order, pursuant to Pa.R.A.P. 341(c). **See** Pa.R.A.P. 341(c) (providing that "the trial court … may enter a final order as to one or more but fewer than all of the claims and parties only upon an express determination that an immediate appeal would facilitate resolution of the entire case"); Order, 6/20/24, at 2 (expressly stating that "an immediate appeal would facilitate resolution of the entire case"). "If such a determination is made, an immediate appeal of an otherwise unappealable interlocutory order may be filed as of right within 30 days of the date of certification of the order." **Redevelopment Auth. of Cambrian Cnty. v. International Ins. Co.**, 685 A.2d 581, 586 (Pa. Super. 1996) (citation omitted). **See also** Pa.R.A.P. 341(c) ("Such an order becomes appealable when entered.").

[2] **See** Amended Complaint, 11/4/09, at Exhibit A ("Declaration") (creating the Hidden Ridge Condominium).

$251,725[.00]. Scioto filed an appeal to this Court, which affirmed the judgment.

> [1] P. Ronald Sabatino is the managing member of Scioto and T&R Properties, which was also a named defendant in the original action.

*Hidden Ridge Condo. Ass'ns, Inc. v. Sabatino*, No. 873 WDA 2021, unpublished memorandum at *2-3 (Pa. Super. filed Mar. 9, 2023) (cleaned up).

The parties subsequently reached a resolution of all remaining claims and, on September 26, 2012, they entered into a Settlement Agreement and Release ("Settlement Agreement"). Article II, Sections 1.1 and 1.3 of the Settlement Agreement are relevant to this appeal. Section 1.1 required Scioto to pay Hidden Ridge a total of $650,000.00. Additionally, it provided that Hidden Ridge "shall be solely responsible for the administration and distribution of the settlement proceeds, at the discretion of the Executive Board." Settlement Agreement, 9/24/12, at Art. II § 1.1(c). Section 1.3 stated, in relevant part:

> **1.3 Scioto Build-Out.** Scioto has built only 161 of the 181 condominium units created by the Declaration and the parties agree that the remaining 20 un-built units shall be built (the "Build-Out Units"). Scioto will commence construction on the Build-Out Units no later than April 14, 2013, or as soon thereafter as conditions permit, and shall substantially complete such construction of the Build-Out Units by December 31, 2014, and further agrees that the permanent stormwater detention facilities shall be completed and dedicated[3] to South Park Township by

---

[3] "Dedication of land results when a landowner offers property for public use[,] and it is accepted by or in behalf of the public…." *Coffin v. Old Orchard*
*(Footnote Continued Next Page)*

December 2014. All construction shall be completed in accordance with the developer's agreement with South Park Township, the Declaration and the plans of Hidden Ridge, including, but not limited to, the completion of all permanent stormwater detention facilities, as required by the applicable law, and including, but not limited to, the ordinances of the Township of South Park and the Commonwealth of Pennsylvania. As to the completed common areas and units, the Scioto Defendants[4] shall have no obligation to complete, fix and/or repair any other alleged deficiency described by the Releasing Parties[5] in the Hidden Ridge Action.

*** 

If the Build-Out Units are not substantially completed by December 31, 2014, and/or all permanent stormwater detention facilities are not completed and dedicated to the Township by December 31, 2014, [Hidden Ridge] may file a petition to enforce this Agreement in order to compel Scioto to fulfill the obligations of this provision. Failure to file a petition to enforce this Agreement shall not be deemed a waiver of [Hidden Ridge's] right to do so.

*Id.* at Art. II § 1.3 (cleaned up).

As we previously explained:

On January 20, 2015, Hidden Ridge filed a Petition to Enforce Settlement Agreement, asserting Scioto failed to complete the permanent stormwater detention facilit[ies] and dedicate [the facilities] to South Park Township by December 2014, as required

---

*Development Corp.*, 186 A.2d 906, 909 (Pa. 1962). "There must be an offer and an acceptance[.]" *Id.* (citation omitted).

[4] *See* Settlement Agreement at 1 (defining "Scioto Defendants" as "Defendants P. Ronald Sabatino, Scioto Construction Company, and T&R Properties").

[5] *See id.* (naming "[Hidden Ridge], Jill Wanzie, Tom Burick, Kathleen Rauscher, Karen Lofe and Corey Sigler, as current or former Trustees *ad litem* of the Executive Board of Hidden Ridge…, individually, and on behalf of all current and former unit owners in the Hidden Ridge Association," as the "Releasing Parties").

in the Settlement Agreement. On February 17, 2015, the trial court entered an order granting the petition, and directing Scioto as follows:

> Scioto … shall complete construction of the permanent stormwater detention facilities and take the appropriate steps to have the facilities dedicated to and accepted by the Township, without further delay[,] weather permitting. Should Scioto fail to satisfy any of these obligations by June 30, 2015[, Hidden Ridge] may then proceed with a [m]otion for [s]anctions and request the entry of such sanctions as the court deems appropriate, including an award of reasonable attorney fees and any other reasonable costs associated with the construction and/or acceptance of the stormwater facilities.

Order, 2/17/15 (emphasis [omitted]).

Almost three years later, on January 22, 2018, Hidden Ridge filed a motion for sanctions. It asserted that Scioto "blatant[ly] disregard[ed]" the trial court's February 2015 order and, additionally, "allowed the condition of the pond to deteriorate" such that it was in "need of repair to satisfy the requirements of the Township[.]" Additionally, Hidden Ridge alleged the "downspouts and lines which are in place to convey stormwater" to the pond were "in need of repair … to satisfy the Township standards for acceptance of the permanent stormwater detention facilities."

*Hidden Ridge Condo. Ass'ns, Inc.*, No. 873 WDA 2021 at *4-5 (some internal citations omitted).

The trial court conducted a hearing on April 11, 2018, and found Scioto in contempt of its February 17, 2015 order. Trial Court Opinion ("TCO"), 3/14/24, at 3. A separate hearing was held on July 25, 2018, to determine the sanctions to be imposed. *Id.* Initially, the trial court directed Scioto to pay Hidden Ridge $39,283.05, the amount it determined was necessary to "restore the pond/water detention facility to a functioning condition." *Id.* (citing Order, 8/1/18). However, on October 23, 2018, it amended the

amount to include counsel and expert witness fees, for a total award of $62,507.65 to be paid to Hidden Ridge. *Id.*

Both parties appealed the August 1, 2018 order (Nos. 1307 and 1642 WDA 2018), and Scioto appealed the October 23, 2018 order (No. 1692 WDA 2018). These three appeals were consolidated for disposition, and this Court ultimately reversed the trial court's contempt order and vacated the orders imposing sanctions. *See Hidden Ridge Condo. Ass'n, Inc. v. Sabatino*, 2019 WL 4864066 at \*5 (Pa. Super. Oct. 1, 2019) (noting that mere noncompliance is insufficient to establish civil contempt and determining that, absent any evidence of wrongful intent underlying Scioto's failure to timely complete its work, the trial court abused its discretion in finding civil contempt).[6]

On October 14, 2019, Hidden Ridge filed an amended petition to enforce the Settlement Agreement ("Amended Petition"), asserting that Scioto breached the terms of the agreement and seeking damages "appropriate to place Hidden Ridge in the position [it] would have been in if the Settlement Agreement was not breached[.]" *Hidden Ridge Condo. Ass'ns, Inc.*, No. 873 WDA 2021 at \*8 (noting Hidden Ridge's request for oral argument for the purpose of assessing damages and its assertion that it had "already presented

---

[6] This Court advised, "to the extent Hidden Ridge may conclude that Scioto has not met its obligations under the Settlement Agreement, it may file a separate, revised and/or amended [p]etition to [e]nforce, as set forth in the Settlement Agreement." *Hidden Ridge Condo. Ass'n, Inc.*, 2019 WL 4864066 at \*3 n.6.

substantial evidence" and developed the record at the two prior evidentiary hearings) (citations omitted). Oral argument was held on December 17, 2019, after which the trial court entered an order directing Scioto "to file a reply 'setting forth any defenses [it] intend[ed] to raise' within 30 days." *Id.* at *10 (quoting Order, 12/17/19, at 1).

Accordingly, Scioto filed an answer to Hidden Ridge's Amended Petition, in which it raised several affirmative defenses — including, *inter alia*, mutual mistake, legal impossibility, unclean hands, and an assertion that Scioto was entitled to a setoff against any damages awarded to Hidden Ridge — and requested entry of judgment in its favor. *Id.* at *10-11.[7] Following a period of discovery, the trial court entered an order directing, in relevant part: "As a record has been developed in this case, the pending Petition to Enforce Settlement Agreement as well as the claims of Scioto … raised in [its] Answer and Defenses shall be initially considered by way of dispositive motion." *Id.* at *12 (quoting Order, 1/28/21).

On May 21, 2021, Hidden Ridge filed a dispositive motion as to the issues of liability and damages. *Id.* Scioto filed a responsive brief, arguing, *inter alia*, "that a hearing was required so that it could present its defenses to

---

[7] Scioto also filed a separate complaint against Hidden Ridge at docket no. GD 19-017623 (the "2019 Action"), in which it asserted the same argument that it raised here in its affirmative defense of unclean hands. *Hidden Ridge Condo. Ass'ns, Inc.*, No. 873 WDA 2021 at *10 n.5. The 2019 Action was subsequently consolidated with the present matter and is not relevant to this appeal. *Id.* The trial court eventually stayed "all matters" in the 2019 Action "pending resolution" of the present matter. *Id.* (quoting Order, 3/11/21).

Hidden Ridge's breach of contract argument, which were not relevant at the time of the contempt and sanctions hearings." *Id.* (citation omitted). The trial court declined to conduct a hearing and, on July 16, 2021, entered the following order:

> Upon consideration of [Hidden Ridge's] dispositive motion in the nature of summary judgment as to the issue of liability and certain damages, and any response thereto, it is hereby ORDERED that said Motion is GRANTED.
>
> Judgment is entered in this case against Scioto and in favor of [Hidden Ridge] in the amount of $220,874.25[,] and the quitclaim deed which Scioto recorded on or about October 13, 2017[,[8]] … is hereby ordered to be stricken such that Scioto shall remain responsible for the on-going and continued maintenance of the subject parcel until such time as Scioto petitions the court based upon the Township agreeing to accept and dedicate the subject stormwater facilities.

*Id.* at *13 (quoting Order, 7/16/21, at 1-2 (unpaginated; cleaned up)). Scioto filed a timely notice of appeal at docket no. 873 WDA 2021. *Id.*

On appeal, Scioto argued, *inter alia*, that the trial court erred in granting summary judgment "without permitting Scioto the opportunity to present evidence on its 'fact-laden affirmative defenses.'" *Id.* at *15 (citation omitted). We agreed. *Id.* We determined that the trial court relied on testimony from the prior contempt and sanctions hearings; however, "neither of th[o]se proceedings focused on the critical issue raised [on appeal] — whether Scioto breached the terms of the Settlement Agreement…, and if so,

---

[8] According to Hidden Ridge, the quitclaim deed "purported to convey the parcel where the stormwater detention facilities were located to Hidden Ridge." Amended Petition at ¶8.

- 8 -

whether Scioto can establish a defense to excuse its breach." ***Id.*** at *16-17. Recognizing "the trial court was attempting to streamline this dispute," we opined that, "in doing so, [it] precluded Scioto from having the opportunity to prove its affirmative defenses. No matter how well-intentioned the trial court may be, this Court cannot countenance the deprivation of due process rights." ***Id.*** at *17. As such, we were constrained to vacate the judgment in favor of Hidden Ridge, and we remanded for further proceedings. ***Id.*** at *19 (noting that the trial court may limit any new hearing to evidence and testimony not previously presented).

Following a status conference, the trial court held a non-jury trial on October 5, 2023, limited to testimony relating to Scioto's affirmative defenses. TCO at 6. "[U]pon consideration of the past record, presentation of evidence at the October 5, 2023 hearing, and the parties' respective proposed findings of fact and conclusions of law filed thereafter," the trial court entered judgment in favor of Hidden Ridge in the amount of $218,688.00, plus costs, and struck the quitclaim deed recorded by Scioto on October 13, 2017. Order, 3/14/24, at 1-2 (unpaginated). ***See generally*** TCO (explaining the trial court's reasoning for its decision).

On March 25, 2024, Scioto filed a timely motion for post-trial relief. Prior to the disposition of its post-trial motion, Scioto also filed a notice of appeal from the March 14, 2024 order at docket no. 452 WDA 2024. We declared that appeal premature, explaining that where, as here, a trial court purports to enter judgment simultaneously with the verdict and before the expiration

of the time to file post-trial motions, the judgment is premature and void. *Per Curiam* Order, 5/16/24, at 1 (unpaginated) (citing **Jenkins v. Robertson**, 277 A.3d 1196, 1198 (Pa. Super. 2022)). Additionally, we noted that:

> Appellants must file post-trial motions within ten days of entry of the decision in a non-jury trial. Pa.R.Civ.P. 227.1(c)(2). "Once a post-trial motion is timely filed, judgment cannot be entered until the trial court enters an order disposing of the motion or the motion is denied by operation of law one hundred and twenty days after the filing of the motion." **Melani v. Mw. Eng'g, Inc.**, 909 A.2d 404, 405 (Pa. Super. 2006) (citing Pa.R.Civ.P. 227.4). Moreover, "[t]he entry of an appropriate judgment is a prerequisite to the Court's exercise of jurisdiction[,] and 'an appeal filed while a post-trial motion is pending before [the] trial court will be considered premature.'" **Id.** at 406 (quoting **Croyle v. Dellape**, 832 A.2d 466, 470 (Pa. Super. 2005)).

**Id.** at 1-2 (unpaginated). Accordingly, we vacated the March 14, 2024 judgment, quashed the appeal, and remanded the case to allow either the trial court to dispose of the post-trial motion within 120 days or for the motion to be denied by operation of law. **Id.** at 2 (unpaginated).

On June 20, 2024, the trial court entered an order denying Scioto's motion for post-trial relief and awarding relief in the amount of $218,688.00, plus costs, in favor of Hidden Ridge and against Scioto. Order, 6/20/24, at 1-2 (unpaginated).[9]

On June 26, 2024, Scioto filed a timely notice of appeal. The trial court did not instruct Scioto to file a concise statement of the errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b). Moreover, the trial court filed an

---

[9] Although not relevant to this appeal, we note that the June 20, 2024 order also amended the March 14, 2024 order to correct the recording information regarding the stricken quitclaim deed. Order, 6/20/24, at 2 (unpaginated).

order indicating that its March 14, 2024 opinion "contains the reasons for the decision from which [this] appeal is taken. No additional opinion will be written." Order, 8/8/24 (single page).

On appeal, Scioto presents the following questions for our review:

1. Whether the trial court erred in holding that Scioto is not entitled to a set-off to the amount of damages that the trial court awarded to Hidden Ridge?

2. Whether the trial court erred in awarding Hidden Ridge damages for downspouts and pipes that were not part of the "permanent stormwater detention facilities" referenced in the Settlement Agreement?

3. Whether the trial court erred in awarding Hidden Ridge damages for downspouts and pipes that were not adequately supported by the evidence presented?

Scioto's Brief at 3 (cleaned up).

Scioto's claims essentially challenge the trial court's enforcement of the Settlement Agreement. It is well-settled that:

When reviewing a trial court's decision to enforce a settlement agreement, our scope of review is plenary as to questions of law, and we are free to draw our own inferences and reach our own conclusions from the facts as found by the court. However, we are only bound by the trial court's findings of fact which are supported by competent evidence. The prevailing party is entitled to have the evidence viewed in the light most favorable to its position. Thus, we will only overturn the trial court's decision when the factual findings of the court are against the weight of the evidence or its legal conclusions are erroneous.

*Salsman v. Brown*, 51 A.3d 892, 893-94 (Pa. Super. 2012) (citation omitted).

"Settlement agreements are enforced according to principles of contract law." *Mastroni-Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 518 (Pa. Super.

- 11 -

2009) (citation omitted). "There is an offer (the settlement figure), acceptance, and consideration (in exchange for the plaintiff's terminating his lawsuit, the defendant will pay the plaintiff the agreed upon sum)." *Id.* (citation omitted). It is well-established that:

> When interpreting the language of a contract, the intention of the parties is a paramount consideration. In determining the intent of the parties to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly.
>
> When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.
>
> On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible [to] different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is obscure in meaning through indefiniteness of expressions or has a double meaning. Where the language of the contract is ambiguous, the provision is construed against the drafter.

*Profit Wize Mktg. v. Wiest*, 812 A.2d 1270, 1274-75 (Pa. Super. 2002) (internal citations and quotation marks omitted). "When … an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the

language of the instrument, or latent, created by extrinsic or collateral circumstances." ***Miller v. Poole***, 45 A.3d 1143, 1146 (Pa. Super. 2012).

## First Issue

In its first issue, Scioto claims the trial court erred in holding that Scioto is not entitled to a set-off against the damages awarded to Hidden Ridge. Scioto's Brief at 23. In support of its argument, Scioto avers:

> Pursuant to the Settlement Agreement, Scioto paid Hidden Ridge $650,000.00. Under [Article II, ]Section 1.1(c)[ of the Settlement Agreement], Hidden Ridge was solely responsible for the administration and distribution of the settlement proceeds, at the discretion of the Executive Board.
>
> In 2013, shortly after receiving the $650,000.00, Hidden Ridge utilized its discretion and decided to distribute a portion of the Settlement Agreement proceeds to unit owners. Each unit owner, other than Scioto, received $2,000.00. The money was first used for any unpaid condominium association dues, then put toward future condominium association dues or distributed as cash to the unit owners.
>
> At the time of the $2,000.00 per unit payments in 2013, Scioto owned 56 of the 181 units. Scioto was not aware these payments were made to other unit owners until 2019. Scioto was current on all dues it owed to Hidden Ridge in 2013. Therefore, it would have received $2,000.00 per unit ($112,000.00 total), either as a credit towards future association dues or in cash if it had been treated equal to the other 125 unit owners.

***Id.*** at 24-25 (citations to record omitted).

According to Scioto, "[u]nder both Pennsylvania law and the clear language of the relevant documents governing Hidden Ridge, [it] is entitled to a set[-]off of $112,000.00 against any damages awarded to Hidden Ridge." ***Id.*** at 23. The crux of its argument is based on its assertion that Pennsylvania law requires condominium associations to treat all unit owners equally, in

proportion to their pro rata share of the condominium. *Id.* (citing 68 Pa.C.S. §§ 3101, *et seq.*, the Pennsylvania Uniform Condominium Act (the "Act")). Scioto points to Section 3208(a) of the Act, which requires a condominium's declaration to "allocate a fraction or percentage of undivided interests in the common elements[10] and in the common expenses[11] of the association … to each unit…." *Id.* at 23-24 (quoting 68 Pa.C.S. § 3208(a)). "Once the common element interest and common expense liability[12] are allocated to a unit, that allocation may not be altered without the unanimous consent of all unit owners." *Id.* at 24 (citing 68 Pa.C.S. § 3208(d)). Moreover, Scioto notes that Section 3314(b) mandates the assessment of "common expenses" against "all [the] units in accordance with the common expense liability allocated to each unit ([S]ection 3208) in the case of general common expenses…." *Id.* (quoting 68 Pa.C.S. § 3314(b)).

Additionally, Scioto avers that Hidden Ridge's Declaration provides each unit with an equal percentage of the ownership of common areas and an equal

---

[10] The Act defines "common elements" as "[a]ll portions of a condominium other than the units." 68 Pa.C.S. § 3103.

[11] "Common expenses" are defined as "[e]xpenditures made or liabilities incurred by or on behalf of the association, together with any allocations to reserves…." 68 Pa.C.S. § 3103.

[12] "Common expense liability" is defined as "[t]he liability for common expenses allocated to each unit pursuant to [S]ection 3208…." 68 Pa.C.S. § 3103.

share of the common expense liability. *Id.* Specifically, Section 2.2 of the

Declaration states:

> The condominium may ultimately consist of one hundred-eighty-one (181) units. Each unit shall [have] an equal undivided ownership interest in the common elements ("the Percentage Interest"). The Percentage Interest shall determine the share of common expense liability appurtenant to each unit. The Percentage Interest shall be the decimal equivalent of a fraction, the numerator of which shall be one (1) and the denominator of which shall be the actual number of units for which certificates of occupancy have been issued by South Park Township, as of the time of determining the Percentage Interest. Each unit shall be entitled to one (1) vote in the affairs of the Association.

Declaration at § 2.2 (cleaned up). "In other words," Scioto surmises, "at the

time of the Declaration, … Hidden Ridge … chose to treat each unit owner

equally[,] and it is legally prohibited from altering this equality absent

unanimous consent of the unit owners." Scioto's Brief at 24.

Based on the foregoing, Scioto argues:

> Once Hidden Ridge chose to spend a portion of the settlement proceeds on a distribution, Section 2.2 of the Declaration and Sections 3208 and 3314 of the Act required Hidden Ridge treat all unit owners equally and distribute funds based on the common ownership percentage and common expense liability. The Settlement Agreement provides Hidden Ridge with discretion over how to spend the settlement proceeds[;] however, that discretion is subject to the applicable governing documents and law. Nothing in the language of the Settlement Agreement, Declaration, or the Act permits Hidden Ridge to make an unequal distribution to unit owners and thereby treat Scioto differently than the 125 other unit owners. The $2,000.00 per unit distribution operated as a credit against every unit owners' assessment for common expense liability, except for Scioto's. While the common expense liability decreased for all other unit owners, Scioto's common expense liability remained the same — imposing a higher assessment than all other unit owners in contravention of the governing documents and Pennsylvania law.

- 15 -

*Id.* at 26.

To the contrary, Hidden Ridge contends that the $2,000.00 distributions to unit owners constituted **reimbursement** for costs advanced by those unit owners to bring the claims in this action against Scioto on their behalf and, thus, Scioto's argument is "unfounded." Hidden Ridge's Brief at 19. Moreover, Hidden Ridge emphasizes that Scioto was a defendant in this case and that the settlement funds were paid as a result of claims being made against Scioto. *Id.* It argues that "Scioto is now seeking to offset the amount of the [j]udgment by asserting a right to recover the same money [it] agreed to pay as a result of the settlement in 2012." *Id.*

Likewise, the trial court opined:

Scioto was a payor of at least part of the $650,000[.00] agreed to in [Article II, ]Section 1.1 of the Settlement Agreement. Although a unit owner, Scioto was **not a plaintiff** in the operative complaint at the time of the settlement or an intended payee of the settlement funds.[13] ... It simply does not stand to reason that Scioto, as a defendant, can claim membership in the class receiving the settlement paid out by [the] defendants, and in essence reduce the liability Scioto and Sabatino agreed to pay by claiming this set-off in a subsequent enforcement of the same Settlement Agreement.

TCO at 19 (cleaned up; emphasis added). We agree.

Scioto is attempting to reframe Hidden Ridge's distribution of the settlement proceeds as a distribution of credits towards the unit owners' common expense liabilities. However, it fails to point to any evidence in the

---

[13] **See** TCO at 19 (noting that Article II, Section 1.1 of the Settlement Agreement requires the **Scioto Defendants to pay** a total of $650,000.00 **to the Releasing Parties**).

- 16 -

record to support this claim, other than its own, self-serving testimony. ***See*** Scioto's Brief at 25 (citing N.T. Hearing, 10/5/23, at 75-76 (Mr. Sabatino's testifying that he learned of the payments from another homeowner and that "people were given $2,000 to be used for any unpaid condo dues or future condo dues or the cash itself")). Whereas Hidden Ridge states that it made the distributions to reimburse unit owners for costs that they had advanced to bring the underlying action against the Scioto Defendants. ***See*** Hidden Ridge's Brief at 19.

Regardless, Sections 3208 and 3314 of the Act do not require Hidden Ridge to "treat all unit owners equally," including Scioto, with respect to the distribution of settlement proceeds, because the settlement proceeds do not constitute a "common element" or "common expense" as defined by the Act. ***See*** 68 Pa.C.S. § 3208 (governing the allocation of common element interests, votes, and common expense liabilities); 68 Pa.C.S. § 3314 (governing assessments for common expenses). Rather, these proceeds represent the consideration paid by the Scioto Defendants in return for Hidden Ridge's agreeing to terminate the lawsuit against them. ***See*** Settlement Agreement at Art. II § 1.1 (outlining the monetary consideration to be paid by the Scioto Defendants); ***id.*** at Art. II § 5 ("Promptly following the complete execution of this Settlement Agreement … and receipt of the payment required by paragraph 1.1(a) above, Hidden Ridge Association and the Releasing Parties shall file a Praecipe to Settle, Discontinue and Satisfy with prejudice the Hidden Ridge Action….").

The Settlement Agreement expressly provides that Hidden Ridge "shall be solely responsible for the administration and distribution of the settlement proceeds, at the discretion of the Executive Board." *Id.* at Art. II § 1.1(c). *See also* Scioto's Brief at 25 (acknowledging the same). Based on the plain, unambiguous language of the Settlement Agreement, Hidden Ridge was entitled to distribute the settlement proceeds as it saw fit. Additionally, we agree with the trial court that "it simply does not stand to reason" that Scioto should be entitled to a set-off which would essentially reduce the amount it paid out under the Settlement Agreement for claims that were brought against Scioto. *See* TCO at 19. *See also Binswanger of Pennsylvania, Inc. v. TSG Real Estate LLC*, 217 A.3d 256, 262 (Pa. 2019) (providing that a court should endeavor to interpret a statute or contract in a manner that will effectuate the reasonable result intended, rather than in such a way as to lead to an absurd result). No relief is due on this claim.

**Second & Third Issues**

Scioto's second and third issues contest the trial court's award of monetary damages to Hidden Ridge. In support of its decision, the trial court provided the following summary of the evidence and testimony presented at the April 2018 and July 2018 hearings regarding the costs of repairing the stormwater basin and connecting pipes:

> During the April 2018 hearing, Christopher Sperl ("Sperl") testified as a representative of Matt Mertz Plumbing. He testified that his firm was hired to do camera inspections of underground pipes that connected downspouts in order to drain stormwater. At the inspection that took place no earlier than November 2017,[17] pipes

- 18 -

that connected to buildings 600, 800, and 900 were found to be crushed, not in working order,[18] and not constructed with the kind of pipes required by Ordinance 118.49.5.[19]  Two exhibits, both dated January 20, 2018, were introduced at the April hearing relating to the firm's proposal to repair and replace the pipes.  If work relating to the pipes for all three buildings were completed at the same time, the estimated cost to repair was **$66,000[.00]**.

[17] Sperl's recollection was that it was around November 2017.  The date of his firm's proposal was in January of 2018.

[18] In some cases, it could not be determined whether particular pipes connected to the stormwater detention pond.

[19] [Hidden Ridge] introduced a page from the Township ordinances regarding subdivision and land development at the April 2018 hearing.  This page included major headings[:] "§ 118.48 Stormwater management" and "§ 118.49 Storm sewers and drainage facilities."

At the July 2018 hearing, Robert Eadie ("Eadie") testified as another representative of Matt Mertz Plumbing.  First, the January 30, 2018 documents were reintroduced[,] and he testified that the firm had been contracted by Hidden Ridge to complete the work on buildings 600, 800, and 900.  That work was ongoing at the time of the July 2018 hearing.  Two additional documents from Matt Mertz Plumbing were introduced and admitted at this hearing.  One was a drain replacement contract, which was executed on May 25, 2018.  The other was a second proposal for work to be completed on pipes related to two other buildings — 500 and 700 — dated May 11, 2018.  This proposal quoted **$64,000[.00]** total for the additional work.

The **TOTAL** of all work for which Hidden Ridge executed a contract with Matt Mertz Plumbing to perform on storm drains was **$130,000[.00]**.  Eadie testified on cross-examination that none of the work being done by Matt Mertz Plumbing was to the pond itself.

At both the April and July 2018 hearings, Hidden Ridge called Lawrence P. Lennon, P.E. ("Lennon") as an expert witness.[14] Lennon's firm had performed rehabilitation for municipalities of similar facilities that were no longer meeting the standard[s] in regulation as updated five years prior. Prior to the April 2018 hearing, Lennon had dye testing completed on pipes that were related to buildings 600, 650, 800, 850, and 900, and he testified as to the results at the April hearing.[20] Similar to Sperl, Lennon testified that the pipes he examined did not meet the specifications for pipes in Township Ordinance 118.49.5. At the July hearing, he testified regarding an estimate to remediate and repair the drains and pond. In addition to the pipe repairs detailed above, Lennon estimated an additional **$88,688[.00]** for the stormwater basin itself. This brings the total needed for repair and restoration of facilities related to stormwater management to **$218,688[.00**.]²¹[]

> [20] While bills related to the dye testing were introduced at the 2018 hearing, these are costs incurred in preparation of Lennon's expert testimony for litigation. Therefore, these are not recoverable under the Settlement Agreement.

> [21] Lennon's report contains a mathematical error and reflects a total of $154,688, which was corrected on the record at the July 2018 hearing.

A copy of Lennon's cost estimate was attached to his report dated July 19, 2018[,] as introduced at the July 2018 hearing. The summary of work listed ten items that needed to be completed and focused on restoring the area around the pond[,] including fencing and landscaping, establishing erosion controls, and correcting items that were not built according to specification in the design plans. In addition, Lennon testified that for this kind of facility, the maintenance costs would range between $5,000 and $10,000 annually.²²

> [22] Lennon had not included these estimated costs initially in his report, but because Scioto intended to call an engineer

---

[14] Lennon is registered as a professional engineer in Pennsylvania and employed by Lennon Smith Souleret Engineering. N.T., 4/11/18, at 23.

who had estimated this cost, he was asked to opine about the matter on the record.

At the July 2018 hearing, Scioto called Jim Greene ("Greene"), an engineer from GAI Consultants, who had not prepared an expert report[,] but was permitted to testify about [the] cost to clean up the pond. His estimate was $20,240.00 total to fix the pond and $4,620 per year for maintenance. Greene testified that he used conservative numbers. His suggested budget did not include some items that were included in Lennon's report. Specifically, these were line items 6, 7, and 8 to Attachment A of Lennon's report. The notes explained that these were included to correct construction details included in the design plan but [were] apparently never completed to those specifications.

Lennon's estimate is approximately $25,000.00 higher than the 2015 invoice from Sluciak Contracting, Inc., which was the firm that completed reconstruction of the construction spillway into a stormwater detention pond. That bill[,] dated December 11, 2015[,] was for $63,760.55[,] and was paid by Scioto in full. This invoice was introduced at the July 2018 hearing through [David] Dillon, [a construction manager employed by Scioto,] who also admitted that Scioto had not performed any other maintenance on the pond area since he first came to the site in 2013. Lennon's suggested proposal of work to be done and budget of $88,688.00 is reasonable because it both contemplates correction of defects in the 2015 work and remediation of two going on three years of no maintenance since the pond was converted for stormwater detention.

TCO at 20-24 (cleaned up; emphasis in original).

Instantly, Scioto contests the $130,000.00 portion of the $218,688.00 awarded to Hidden Ridge, claiming said amount represents the estimated cost to repair "downspouts and pipes" that were not part of the "permanent stormwater detention facilities" referenced in the Settlement Agreement.

- 21 -

Scioto's Brief at 28.[15] The crux of Scioto's argument is that these downspouts and pipes **cannot** be included in its obligation to complete and dedicate the permanent stormwater detention facilities because they are "part of **previously constructed** common areas which [it] had no obligation to fix or repair." *Id.* at 29 (citing Settlement Agreement at Art. II § 1.3) (emphasis added). In support of its position, Scioto contends that Section 1.3 only required Scioto "to build and complete construction of things that did not exist at the time of the Settlement Agreement in 2012." *Id.* Therefore, it concludes the permanent stormwater detention facilities referenced in Section 1.3 "can **only** include" elements that had not yet been constructed in 2012. *Id.* at 29-30 (emphasis added). *See also id.* at 30 (insisting that the permanent stormwater detention facilities "cannot include **any** of the completed common areas") (emphasis added); *id.* (recounting Gary Wargo's testimony that "the downspouts and pipes were constructed and completed between 2002 and 2010 and already in place at the time of the Settlement Agreement");[16] *id.*

_____

[15] Scioto does not contest the remaining portion of the award, which appears to represent the amount needed to repair the stormwater basin. *See* TCO at 22 (noting that Lennon estimated $88,688.00 for repair of the stormwater basin). Thus, we deem any objection to said amount waived. *See Kaur v. Singh*, 259 A.3d 505, 511 (Pa. Super. 2021) ("When an appellant fails to properly raise and develop issues in briefs with arguments that are sufficiently developed for our review, we may … find certain issues waived.").

[16] Hidden Ridge called Gary Wargo ("Wargo") as a witness at the April 11, 2018 hearing. Wargo was employed by South Park Township as "the Code Enforcement Officer" at all relevant times to this matter. N.T., 4/11/18, at 51-52.

(averring that the downspouts and pipes "were not capable of being 'completed' by 'December 2014[,'] because they already were complete"). Scioto's argument is belied by the record.

In construing the intent of the parties, we turn to the language of the Settlement Agreement. ***See Profit Wize Mktg.***, ***supra***. Section 1.3 provides that, in addition to substantially completing construction of the Build-Out Units, Scioto

> agrees that the permanent stormwater detention facilities shall be completed and dedicated to South Park Township by December 2014. All construction shall be completed in accordance with the developer's agreement with South Park Township, the Declaration and the plans of Hidden Ridge, including, but not limited to, the completion of all permanent stormwater detention facilities, as required by the applicable law, and including, but not limited to, the ordinances of the Township of South Park and the Commonwealth of Pennsylvania. **As to the completed common areas** and units, the Scioto Defendants shall have no obligation to complete, fix and/or repair any **other** alleged deficiency described by the Releasing Parties in the Hidden Ridge Action.

Settlement Agreement at Art. II § 1.3 (cleaned up; emphasis added).

Scioto's argument that it "has no duty to fix or repair **any** 'completed common areas or units' under the plain language of Section 1.3," Scioto's Brief at 33 (cleaned up; emphasis added), is disingenuous and misleading, as it ignores the word "other" in the sentence referring to its duties regarding completed common areas. We give effect to each term included in the Settlement Agreement, as we do not assume the parties chose the language in their contract carelessly. ***See Profit Wize Mktg.***, 812 A.2d at 1274. Nor do we assume that the parties were ignorant of the meaning of the language

they employed. *See Mitch v. XTO Energy, Inc.*, 212 A.3d 1135, 1138-39 (Pa. Super. 2019). We construe any terms that are not defined in the contract "in accordance with their natural, plain, and ordinary meaning." *Profit Wize Mktg.*, 812 A.2d at 1274. *See also Allstate Fire and Cas. Ins. Co. v. Hymes*, 29 A.3d 1169, 1172 (Pa. Super. 2011) (stating that a court may inform its understanding of words of common usage by considering their dictionary definitions).[17]

When used as in the context here, the adjective "other" is consistently defined in dictionaries as meaning something that is in addition to or different from that which was **previously mentioned**. For instance, the Webster's New Universal Unabridged Dictionary defines "other," in relevant part, as "different or distinct from that or those referred to or implied; … further or additional…." Webster's Unabridged Dictionary 1268 (2d ed. 1983). Similarly, the online version of the Merriam-Webster Dictionary defines "other," in part, as "being the one or ones distinct from that or those first mentioned or implied; … additional." *Other*, Merrian-Webster, https://www.merriam-webster.com/dictionary/other (last visited Apr. 17, 2025). *See also Other*, Britannica, http://www.britannica.com/dictionary/other (defining "other," as relevant here, as something that is "in addition to the person or thing that has already been mentioned[;] different or separate from the person or thing that has already been mentioned") (last visited Apr. 17, 2025).

_____

[17] The Settlement Agreement does not define the term "other."

Applying this common use of the term "other," we discern from the plain language in the Settlement Agreement that Scioto has no obligation to complete, fix, or repair **any further or additional** deficiencies alleged in the Hidden Ridge Action regarding completed common areas **other than those already referred to** in Section 1.3, *e.g.*, the completion and dedication of the permanent stormwater detention facilities in accordance with applicable law. As such, Scioto's argument that its obligation to complete the permanent stormwater detention facilities can only include elements that had not yet been constructed at the time of the Settlement Agreement fails.

Next, Scioto argues that the term "permanent stormwater detention facilities" does not include downspouts and pipes which are in place to **convey and divert** stormwater to the detention pond. **See** Scioto's Brief at 31. **See also id.** at 30 (citing Mr. Wargo's testimony that "the term 'stormwater retention facility' does not include inlets, pipes, the collection system, or rain leaders"). Scioto advances that it agreed to complete the permanent stormwater detention facilities — not to be responsible for the entire stormwater management system. **Id.** at 33. It further contends that "there is no evidence … the parties thought the [d]ownspouts and [p]ipes were included in the permanent stormwater detention facilities…." **Id.** at 31. **See also id.** at 33 (averring that the "issues related to the [d]ownspouts and [p]ipes were not discovered until 2017").

On the other hand, Hidden Ridge maintains that the downspouts and pipes **are** included in Scioto's obligation to complete and dedicate the

permanent stormwater detention facilities. Hidden Ridge's Brief at 25, 30. It argues:

> Section 1.3 of the Settlement Agreement … created an obligation for Scioto to complete **ALL** permanent storm water detention **facilities** in accordance with the Township requirements and those of the Commonwealth of Pennsylvania. As the pipes which convey water to the pond are part of the facilities and their condition does not satisfy the Township ordinances and requirements of the Commonwealth, the trial court properly found Scioto responsible for the damages which were awarded.

*Id.* at 30 (cleaned up; some emphasis added). *See also id.* at 27 (noting that "[t]he record includes extensive evidence which establishes defects associated with the construction and/or acceptance of the facilities by the Township"); *id.* at 27-29 (summarizing the testimony of Sperl and Lennon regarding the pipes' noncompliance with local ordinances); *id.* at 29 (stating that Wargo "confirmed the purpose of the pipes was to convey water to a drainage facility and agreed that these pipes are part of the permanent stormwater facilities") (citation to record omitted). Hidden Ridge further notes that the term "permanent stormwater detention facilities" is not defined in the Settlement Agreement and suggests that any ambiguity as to what components are included in this term should be construed against Scioto as the scrivener of the agreement. *Id.* at 25.

To determine the intent of the parties, we again turn to the language contained in Section 1.3 of the Settlement Agreement. Significantly, we note the parties' use of the word "facilities" in the plural, rather than "pond" or "basin." *See* Settlement Agreement at Art. II § 1.3 (outlining Scioto's

obligations pertaining to the "permanent stormwater detention **facilities**") (emphasis added). The online edition of the Cambridge Dictionary defines the plural noun "facilities," in pertinent part, as "the buildings, equipment, and services provided for a particular purpose[.]" *Facilities*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/facility (last visited Apr. 17, 2015). It appears that the purpose of the facilities as described in the Settlement Agreement is to detain stormwater. However, we agree with Hidden Ridge that the phrase "permanent stormwater detention facilities" is ambiguous, as this term is not defined in the Settlement Agreement and can reasonably be interpreted as including (or not including) different components of the stormwater management system, *i.e.*, downspouts and pipes. **See Profit Wize Mktg.**, **supra**.

"It is hornbook law that in determining the intent of the parties, ambiguities are to be construed against … the contract drafter." **Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd.**, 739 A.2d 133, 139 (Pa. 1999). **See also Central Transp., Inc. v. Board of Assessment Appeals of Cambria Cnty.**, 417 A.2d 144, 149 (Pa. 1980) ("[I]t is well settled that a written agreement will be construed against the party preparing it.") (citations omitted). In the case *sub judice*, the trial court found counsel for Scioto to be the "scrivener" of the Settlement Agreement. **See** TCO at 25; N.T., 7/25/18, at 171-73 (the trial court's ruling that the Settlement Agreement was a "negotiated agreement" but that the actual scrivener was Scioto's counsel; defining "scrivener" as "the preparer, the

typist, the writer").[18] As the preparer of the document, Scioto had the opportunity to include in the Settlement Agreement a description of the components that make up the permanent stormwater detention facilities, but it failed to do so.

We are also cognizant, however, that "[w]hile it is a well settled rule of construction that in cases of ambiguity, [contracts] should be construed most strongly against the drafter[,] … it is equally clear that the rule is not intended as a talisman solution to the construction of ambiguous language." ***Burns Mfg. Co. Inc. v. Boehm***, 356 A.2d 763, 766 n.3 (Pa. 1976). "Where a document is found to be ambiguous, inquiry should always be made into the circumstances surrounding the execution of the document in an effort to clarify the meaning that the parties sought to express in the language which they chose." ***Id.*** Thus, given the ambiguity here, we discern that the trial court appropriately considered extrinsic evidence and regarded the circumstances surrounding the execution of the Settlement Agreement to ascertain and give effect to the intention of the parties. ***See id.***; ***Miller***, ***supra***.

---

[18] To the extent Scioto attempts to argue that the trial court erred in finding that Scioto was the scrivener of the Settlement Agreement, we deem this claim waived due to Scioto's failure to include it in its "Statement of the Questions Presented." ***See*** Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."); ***Wirth v. Com.***, 95 A.3d 822, 858 (Pa. 2014) ("[Rule 2116(a)] is to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby.").

For instance, the trial court considered evidence produced by the parties as to whether reference to "permanent stormwater detention facilities" could include equipment other than the stormwater pond or basin itself. Hidden Ridge's expert witness, Lennon, explained that "downspouts" or "roof drains" or "rain leaders" connect to underground pipes which ultimately connect to the storm sewer and the "storm detention facility." N.T., 4/11/18, at 45-46. The following colloquy between Scioto's counsel and Lennon provided further clarification:

Q. So the ... rain leader and that pipe are part of the stormwater management system; correct?

A. That's correct.

Q. Does the stormwater management system incorporate a stormwater detention facility?

A. Yes, it would.

Q. So this detention facility is separate and apart from the rain leader and this branch pipe; correct?

A. I think they're all part of the whole.

Q. They're a part of the stormwater drainage system; correct?

A. Stormwater drainage, stormwater management. Frankly, you can't have one without the another [*sic*].

Q. But are they part of the stormwater detention facility?

A. They are an extension of it.

Q. They connect to it?

A. Yes.

Q. These items connect to a stormwater detention facility?

A. Yes, they're part of it.

*Id.* at 47-48 (cleaned up). *See also id.* at 85 (Wargo's agreeing that the underground pipes which convey water to the pond are a permanent part of the stormwater facility); *but see id.* at 63-64 (Wargo's agreeing that "the pipes and detention facilities are separate items in the storm[w]ater management system"; stating that he considers the pond to be "the management system" and the pipes and rain leaders as part of "the collection system").

Additionally, the trial court emphasized Scioto's obligation under the Settlement Agreement to complete **and dedicate** the stormwater detention facilities to the Township and to do so **in compliance with local ordinances**. *See* TCO at 24-26; Settlement Agreement at Art. II § 1.3 (stating that the permanent stormwater detention facilities "shall be completed and dedicated to South Park Township" and that "[a]ll construction shall be completed in accordance with … the applicable law, … including, but not limited to, the ordinances of the Township of South Park and the Commonwealth of Pennsylvania"). Noting that dedication "would have shifted ongoing responsibility for maintenance of [the permanent stormwater detention] facilities from Hidden Ridge to the Township," the trial court determined that dedication of the facilities constituted a material term of the Settlement Agreement. TCO at 25.

The trial court found, however, that pipes installed underground as part of the stormwater management system were not in compliance with local ordinances. *See* TCO at 20-22. *See also* N.T., 4/11/18, at 9-10, 12 (Sperl's

testifying that the pipes he inspected were "four-inch black corrugated pipe" that "crushes" and were not in compliance with Ordinance 118.49.5, which requires roof drains to be connected to "four-inch Schedule 40 PVC or ABS pipe"); *id.* at 29 (Lennon's explaining that Ordinance 118.49.5 "specifically requires storm drains [to] be connected directly to underground pipes which shall flow into an approved storm drainage system" and opining that the dye testing determined "these [drains] were not … actually physically connected to a storm pipe system"); *id.* at 30 (Lennon's agreeing with Sperl that Ordinance 118.49.5 "specifically calls for Schedule 40 ABS, PVC, or SDR 35 pipe" — a particular type of pipe with a certain wall thickness that is intended to be buried underground — and stating that "[t]he pipe that was installed did not meet the requirement").

Moreover, the trial court took into consideration a local ordinance that was amended prior to the execution of the Settlement Agreement to reflect the Township's position that it would no longer accept dedications of stormwater facilities. *See* TCO at 15; N.T., 4/11/18, at 58-59 (Wargo's recalling that the ordinance regarding dedication of stormwater detention facilities was amended in either 1999 or 2000). It found that Sabatino, as principal of Scioto, was fully aware of this amendment at the time the Declaration was drafted in 2003, long before the parties entered into the Settlement Agreement. *See* TCO at 15; *id.* at 25 ("Sabatino knew from the process of planning the condominium development that the storm[w]ater facilities were to remain the responsibility of Hidden Ridge under the Township

ordinances."). Nonetheless, the trial court determined that Sabatino agreed on behalf of Scioto to a Settlement Agreement which required dedication of the stormwater detention facilities. *Id.* at 15, 25.[19]

Notwithstanding the amendment of the Township's ordinance, the trial court determined that compliance with Scioto's obligation to dedicate the stormwater detention facilities was not a legal impossibility, noting Wargo's testimony that "developers regularly request variances…." *Id.* at 17. *See also* N.T., 4/11/18, at 55 (Wargo's acknowledging that developers ask for exceptions "all the time"); *id.* at 66 (Wargo's stating that the developer submits a letter to the Township "requesting dedication or acceptance"); *accord id.* at 38-39 (Lennon's noting that it is common for developers to initiate a request for dedication when the work is complete). It explained that "[t]he very minimum Scioto needed to do in furtherance of this obligation was to make a formal written request for a variance from the Township." TCO at 25.[20] However, Scioto never did so. *Id.* at 16.

Based on the foregoing, the trial court opined:

> Scioto did not make a good faith effort to seek dedication of the facilities and Sabatino's commitment on behalf of Scioto to do so was made despite knowledge of the difficulty of the task. It is

---

[19] The trial court noted that there is no evidence of record Hidden Ridge was aware that the Township had amended its ordinance and was no longer accepting dedications of stormwater detention facilities. TCO at 15.

[20] Because the Township was not a party to the litigation or the Settlement Agreement, the trial court acknowledged that "it certainly had no obligation to accept dedication." TCO at 25. However, it noted that "a variance could have been sought…." *Id.* at 26.

now going on eleven and a half years since the Settlement Agreement was executed and nine and [a] half years since the date the obligations relating to construction were to be fulfilled. It is clear that Sabatino's fatalistic beliefs about the possibility of success are why no substantial attempts were made to comply, and that no compliance with that material term could be forthcoming.

*Id.* at 26.

Having determined that Scioto had breached its obligations under Section 1.3, the trial court then considered Hidden Ridge's argument that Scioto's breach of the Settlement Agreement entitles Hidden Ridge to damages that would place Hidden Ridge in the position it would have been in but for the breach. **See** Hidden Ridge's Brief at 26 (citing **Felix v. Giuseppie Kitchens & Bath, Inc.**, 848 A.2d 943 (Pa. Super. 2004)).

In **Felix**, the appellee hired the appellants to remodel and reconstruct portions of her home. **Felix**, 848 A.2d at 945. As part of the remodel, the appellee purchased kitchen cabinets from the appellants, which were manufactured by Plain and Fancy. **Id.** In November of 1998, the appellee filed suit against the appellants, claiming breach of contract, negligent and fraudulent conduct, and violations of the Unfair Trade Practices and Consumer Protection Law. **Id.** In September of 2002, the parties entered into a settlement agreement. **Id.** In pertinent part, to the extent that any cabinets from the appellee's original order were deemed to be missing and/or not in factory new condition, the settlement agreement obligated the appellants to order "at their cost, new, identical cabinets," from Plain and Fancy to be

delivered to the appellee within six weeks of the date of execution of the settlement agreement. *Id.* at 945-46.

Following an evidentiary hearing on the appellee's motion to enforce the settlement agreement, the trial court found that the appellants were in default of their obligation under the settlement agreement and entered judgment, directing the appellants, in part, to pay to the appellee "$20,551.25[,] plus interest[,] which represented the cost of the cabinets that [the a]ppellants had failed to order/replace…." *Id.* at 946. The appellants filed an appeal, arguing, *inter alia*, that the trial court erred in "rewriting the terms of the settlement agreement" and "substituting monetary damages for the cabinetry negotiated in the settlement agreement[.]" *Id.* We rejected the appellants' argument and affirmed the trial court's decision awarding the appellee the cost value of the cabinets, which would essentially place her in the position she would have been in but for the appellants' breach. *Id.* at 949-50. *See also id.* at 950 (noting that the "valuation [which] was based on an invoice supplied by the cabinet's manufacturer, would permit [the a]ppellee to order the cabinets she had bargained for" from a different supplier).

Persuaded by *Felix*, the trial court in the case *sub judice* calculated the amount that would be needed to make Hidden Ridge whole to date in lieu of dedication of the permanent stormwater detention facilities to the Township. *See* TCO at 26-27. In doing so, it considered witness testimony regarding the estimated cost to repair the underground pipes in compliance with the applicable laws, as well as for the cost of repairing the detention pond itself.

Based on these estimates, which are summarized *supra*, the trial court concluded that Hidden Ridge was entitled to "an award in the amount of $218,688.00[,] for work … on underground pipes that are a part of the storm[w]ater management system and … for the work on the pond." TCO at 26.[21, 22] Viewing the evidence in the light most favorable to Hidden Ridge as the prevailing party, we discern no error of law on the part of the trial court and conclude that there is competent evidence in the record to support the trial court's decision. **See Salsman**, **supra**.

Finally, Scioto claims that, even if the pipes are deemed to be included in its obligation to complete and dedicate the permanent stormwater detention facilities, the damages awarded to Hidden Ridge are not adequately supported by the evidence presented. Scioto's Brief at 34. It contends that "Hidden Ridge only provided evidence of deterioration in 2018 — six years after the 2012 Settlement Agreement[] and three years after Scioto's breach of the Settlement Agreement in 2015." **Id. See also id.** at 35, 37 (suggesting that "the relevant time period for measuring damages" is 2015); **id.** at 37 ("Hidden Ridge presented no evidence that the permanent stormwater detention

_____

[21] The total monetary award of $218,688.00 is comprised of $130,000.00 (the cost of repairing the pipes which the trial court deemed part of the stormwater management system) and $88,688.00 (the costs of repairing the stormwater basin itself). **See** TCO at 21-22.

[22] While the trial court did not make an explicit finding as to the parties' intention regarding the use of the term "permanent stormwater detention facilities," we discern from its decision that the trial court found Scioto's obligation under the Settlement Agreement included repairing the pipes to comply with the applicable laws.

facilities were in need of repair or maintenance in late 2015."). This claim is wholly without merit.

Following the precedent established by this Court in **Felix**, the trial court decided to award Hidden Ridge the amount it deemed necessary to place Hidden Ridge in the position it would have been in if Scioto had not breached the Settlement Agreement. **See** TCO at 26 (concluding that the estimates provided at the April 2018 hearing suffice under **Felix** "to make Hidden Ridge whole to date"). We surmise from the trial court's opinion that it found Scioto was responsible under Section 1.3 of the Settlement Agreement for repairing the pipes, bringing them to a standard that would be acceptable for dedication. **See** TCO at 26-27 (stating that Hidden Ridge is entitled to damages "for work performed on underground pipes that are a part of the storm[w]ater management system"); Scioto's Brief at 30 (acknowledging that the pipes were installed prior to the parties' execution of the Settlement Agreement); N.T., 4/11/18, at 9-10, 12, 30 (Sperl's and Lennon's testifying that the type of pipes that were installed are not in compliance with local ordinances). We deem the amount awarded by the trial court to be sufficiently supported by competent evidence in the record, as outlined above, and we discern no error of law.

Accordingly, we affirm the order entered on June 20, 2024, which denied Scioto's request for post-trial relief and awarded Hidden Ridge $218,688.00, plus costs.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE:  5/6/2025